UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

      Plaintiff,

 -vs-                          Case No. 17-CR-100-WMC

DAVID TJADER,                Madison, Wisconsin
                              July 2, 2018
        Defendant.        1:09 p.m.
_____

STENOGRAPHIC TRANSCRIPT OF SENTENCING
HELD BEFORE U.S. DISTRICT JUDGE WILLIAM M. CONLEY


APPEARANCES:

For the Plaintiff:

             Office of the United States Attorney
             BY:   ELIZABETH ALTMAN
             Assistant United States Attorney
             222 West Washington Avenue, Suite 700
             Madison, Wisconsin  53703


For the Defendant:

             Jones Law Firm
             BY:   WILLIAM R. JONES
             P.O. Box 44188
             Madison, Wisconsin  53744


Also appearing:   DAVID TJADER, Defendant
                 MARIAH JOHNSON, U.S. Probation Officer


Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
1              (Proceedings called to order at 1:09 p.m.)

2              THE CLERK:  Case No. 17-CR-100-WMC-1, United States of

3    America v. David Tjader.  Court is called for a sentencing.

4         May we have the appearances, please.

5              MS. ALTMAN:  Good afternoon, Your Honor.  The United

6    States appears by Elizabeth Altman.

7              MR. JONES:  Good afternoon, Your Honor.  Mr. Tjader is

8    here in person and with his attorney, William Jones.

9              THE COURT:  Good afternoon, all.

10        We are here for a sentencing of David Tjader --

11             THE DEFENDANT:  Tjader.

12             THE COURT:  Tjader.  Thank you.  And my first

13   obligation, Mr. Tjader, is to ask whether you've had an

14   opportunity to read and discuss the presentence report and the

15   addendum and revised presentence report with your counsel?

16             THE DEFENDANT:  One second.  Was the revised one what

17   we just went over?

18             MR. JONES:  Yeah.

19             THE DEFENDANT:  Okay.  Yes.

20             THE COURT:  Thank you.  Then I'll ask the government if

21   there was an additional motion -- or a motion for an additional

22   one-level reduction for acceptance of responsibility?

23             MS. ALTMAN:  Yes, Your Honor.

24             THE COURT:  Also, if you could advise me, Ms. Altman,

25   whether or not there were any victims who wished to speak.
```

1          MS. ALTMAN:  There are no victims that wish to speak,

2     Your Honor.  We did comply with our notification obligations.

3          THE COURT:  Understood.  And I saw that you filed under

4     seal victim statements.

5          With that, I will accept the plea agreement finding that

6     the offense of conviction adequately reflects the defendant's

7     criminal conduct and the plea agreement does not undermine the

8     statutory purposes of sentencing.  In determining the

9     defendant's sentence, I will take into consideration the

10    advisory sentencing guidelines and be governed by the statutory

11    purposes of sentencing that is set forth at Section 3553(a) of

12    Title 18.

13         While the government had no objections to the presentence

14    report, the defendant raised an objection to the number of

15    images included in the guideline calculation, asserting that

16    because devices seized from the defendant's residence were not

17    in working order, the images found on these computers should not

18    be considered for relevant conduct.  Further clarification from

19    the case agent, however, indicates that these devices were not

20    only operable but were actually navigable and that images found

21    on the devices were easily accessible by a user.  Moreover, they

22    reflect what would have been viewed in the past, and I don't see

23    any reason to exclude them.  Therefore, the defendant would have

24    been able to access these images at any time or at least at some

25    period of time, and they accurately are considered for purposes

1       of determining relevant conduct.

2            The defendant further asserts that a downward departure is

3       warranted for a number of the images used because the

4       video-to-image conversion utilized by the guideline is arbitrary

5       and overstates the quantity of images involved in the offense.

6       The Court further recognizes that this calculation can overstate

7       the severity of the defendant's conduct, and it will consider

8       this when determining the appropriate sentence.  At the same

9       time, it will consider that there may have been live visual

10      depiction of particularly horrific form as well.

11           The defendant also raised several objections regarding the

12      language used in the presentence report claiming it misleads the

13      reader in making false assumptions about the defendant.

14      Similarly, the defendant objected to the use of the information

15      provided by the defendant to the polygraph examiner.  However,

16      the defendant's statements and information provided are

17      appropriate to consider, not only because they were included in

18      the investigative materials but because they represent

19      information willingly provided to investigators by the

20      defendant.  Moreover, the defendant's success on supervision

21      depends on his willingness to address his specific risks and

22      treatment needs and to ensure that he will not be a danger to

23      the community upon his release from prison.  The defendant's

24      statements have been noted in the report.  However, I believe

25      the information from investigative materials were appropriately

1    included as well.

2         Finally, the defendant raised several objections to the

3    proposed special conditions of supervised release numbered 12,

4    13, 14, 16, and 19.  Justification for those conditions will be

5    addressed following the imposition of sentencing today.  All of

6    the imposed conditions address risks that are occasioned by the

7    offense of conviction and the defendant's personal history and

8    characteristics.

9         Accordingly, I find the probation office has calculated the

10   advisory guidelines correctly using the current manual and

11   supplement and taking into account all relevant conduct under

12   Section 1B1.3.  The guideline for receipt of child pornography

13   in violation of Section 2252(a)(2) of Title 18 is found at

14   Section 2G2.2.  Under subsection 2(a)(2), the base offense level

15   is 22.

16        However, under subsection 2(b)(1), two levels are removed

17   because there is no evidence to suggest that the defendant

18   intended to further traffic or distribute the images and videos

19   that he received.

20        In contrast, two levels are added under subsection 2(b)(2)

21   because one image and two videos retrieved from the defendant's

22   email contain minor females ranging in age from 6 to 12 years.

23        Under subsection 2(b)(4), four levels are also added

24   because some of the materials portray bondage, sadism, and

25   violent sexual abuse or exploitation of an infant or toddler.

1        Two more levels are added because the defendant utilized

2    his computer and various online accounts and servers to receive

3    child pornography under subsection 2(b)(6).

4        Finally, under subsection 2(b)(7)(D) and comment note 6(B),

5    five levels are added because the offense involved 138 images

6    and 118 videos, nearly 9,000 images in total.

7        No other Chapter Two adjustments apply, and while the Court

8    will consider the totality of defendant's conduct when

9    determining if further reduction should be granted under Section

10    5K2.0 for enhancement for the number of images possessed or

11    received under 2G2.2(b)(7), the defendant has viewed child

12    pornography for an extended period.  He admitted beginning to

13    view child pornography as early as 2002 with some interruptions.

14    Much more disturbing to the Court, investigative material

15    suggests he solicited certain kinds of graphic and live images

16    of sexual abuse of minors, including images in exchange for

17    payment.  Given this active promotion of the creation of

18    horrific child pornography as well as the number of images on

19    devices in his possession at the time of the search warrant, a

20    five-level increase, I believe, is warrant.

21        Accordingly, while the defendant did not qualify for

22    enhancement for a pattern of conduct under 4B1.5, neither does

23    his criminal history underrepresent under Section 4A1.3.

24    Therefore, no further adjustments are warranted for images,

25    although I will, as I've said, consider the totality of the

1    circumstances under Section 3553(a).

2       The defendant does qualify for a three-level downward

3    adjustment under Section 3E1.1 because he demonstrated

4    acceptance of responsibility for his offense and the government

5    has moved for the additional reduction.

6       With a total offense level of 20 [verbatim] and a criminal

7    history category of I, therefore, the defendant would ordinarily

8    have an advisory guideline imprisonment range of 97 to 121

9    months.  However, as has been the practice of this court, the

10    guideline calculation is affected by the enhancement for use of

11    a computer required in this type of an offense, which adds two

12    levels.  This warrants a departure under 5K2.0 as a matter of

13    standard practice in this court to achieve parity with others

14    similarly situated to the offender, although the government is

15    quite correct to point out the interactive nature of some of the

16    defendant's apparently live shows over computers, which

17    differentiates his conduct and will be a factor the Court will

18    also consider under Section 3553(a).

19       With this two-level downward departure, it leaves the

20    defendant a total offense level of 28.  Coupled with his

21    criminal history category of I, the guideline imprisonment range

22    here is 78 to 97 months, and that's where the Court will begin

23    thinking about an appropriate sentence for this defendant.

24       Admittedly, some of the images and some of the texts from

25    this defendant, no matter how the defense attempts to

1    characterize them as simply being provocative, are quite

2    disturbing and justify a substantial sentence both out of

3    concern for this defendant and particularly out of concern for

4    protection of the public, but he is a first offender, and

5    notwithstanding the government's reasonable argument that he may

6    have been offending for some time, the fact is he's only been --

7    he's never been convicted of a crime of any kind, and that is a

8    factor I will consider along with what I think is inarguably his

9    likely vulnerability while incarcerated.

10          And with that, I'll hear first from the government and then

11   from the defendant.

12          MS. ALTMAN:  I don't have anything to add to my

13   sentencing memo, Your Honor.

14          THE COURT:  Very good.

15       Mr. Jones, is there anything you want to add to your memo?

16          MR. JONES:  I think I may have heard you say that after

17   the adjustment, the removal of the use of computer, the

18   guideline was 28.  If I heard wrong -- I think you meant 18,

19   unless you did say 18 and I misheard, but it's 18, criminal

20   history I --

21          THE COURT:  The offense level is 28.  It was 30.

22          MR. JONES:  Oh, okay.  Thank you.

23          THE COURT:  That's what I said was 28.

24          MR. JONES:  Understood.  I thought you said something

25   about 20, criminal history I, but that --

1          THE COURT:  No.  He has a criminal history category of

2     I and an offense level of 28 after reducing for the two computer

3     points, which gives him a guideline range of 78 to 87 [verbatim]

4     months.

5          MR. JONES:  Okay.  Thank you, Your Honor.

6          THE COURT:  No, that's fine.

7          MR. JONES:  I appreciate it.  I just wanted to --

8          THE COURT:  Anything else you want to add, Mr. Jones?

9          MR. JONES:  Just -- I wrote a sentencing memo.  I think

10    that --

11         THE COURT:  And I did read it with care.

12         MR. JONES:  You obviously gave it some consideration

13    based upon comments you've already made.  It was my position

14    that it does suggest that there may be more a search for

15    shocking communication and interaction which was what was being

16    sought versus the actual images, but that's, I guess,

17    speculation.  I can't really say what the anticipated reaction

18    was.  The reality is, as Mr. Tjader has come to hear multiple

19    times -- I'm sure it's sinking is -- is it really doesn't

20    matter.  It could lead people to behavior, and I don't know that

21    he fully had thought that through.  That is just, I guess, the

22    mitigating argument that I had provided to the Court.

23         I also point out that there's family statements of support.

24    They suggest that, having observed him growing up, that he was

25    in a healthy atmosphere, and I think that that suggests that

1     someone such as Mr. Tjader may have less of a road to

2     rehabilitation and realization of the correct behavior in our

3     community.  He also demonstrated a good work history, lengthy,

4     consistent employment, and good comments from his employer.

5          So I do rely primarily on the sentencing memo and my

6     comments in there to advocate for a sentence of 60 months.

7               THE COURT:  Mr. Tjader, is there anything you'd like to

8     say before I render sentence?

9               THE DEFENDANT:  I'm not good at public speaking.  Yes.

10    Give me a couple minutes.

11              THE COURT:  Sure.  Take the time you need.

12         It's not necessary that you speak.  You certainly have a

13    right to do so, and you can also ask statements be made on your

14    behalf by your counsel.  I'm happy to proceed on any basis you

15    wish.

16              THE DEFENDANT:  Your Honor -- sorry.  Nervous habit.

17    Your Honor, I am sorry about that, and I obviously need help

18    but -- I have been -- since the day I was picked up, I have

19    actually been trying to, if any way possible, help the FBI in

20    anything if they need it, but they obviously don't need my help.

21              THE COURT:  One of the interesting things about your

22    case is how long you've been involved in online pornography.

23    You seem to have sort of entered in about the same time that

24    peer-to-peer or computer access was possible and have somewhat

25    grown with the development in that you were involved in a fairly

1    sophisticated exchange of images from the Philippines.

2            THE DEFENDANT:  You want to hear something even more

3    interesting?  Although I've had computers for a really long

4    time, I don't know a lot about computers.  I mean, I figured out

5    how to use Limewire -- that's obvious -- but I didn't know how

6    to -- like they told me Ares.  Did I download Ares online?

7    Probably.  I don't remember using it ever.  I've downloaded lots

8    of programs that I maybe attempted to use a couple of times but

9    couldn't figure them out and then just left them alone, but

10   they're still on my computer.

11           THE COURT:  But you also used some of those programs to

12   reach into parts of the internet that are not easily accessed

13   and to do so repeatedly.

14           THE DEFENDANT:  If that's the case, that would have

15   been accidental because, like I said, I'm not really good at use

16   of computers, and I'm not sure what you're talking about by what

17   parts of the internet are not easily accessible.

18           THE COURT:  Your experience was mostly online through a

19   Yahoo! account?  What other methods did you use to communicate?

20           THE DEFENDANT:  Oh, the Yahoo! account, I actually did

21   not set that up.  I was on -- well, it was Limewire.  I used

22   Yahoo! and Facebook.  Facebook was just recent but --

23           THE COURT:  And Gmail accounts and other email accounts

24   of various kinds.

25           THE DEFENDANT:  Yeah.  But Yahoo! Messenger, I

```
1    couldn't -- I didn't set that up.  I was on a legal site talking

2    to somebody -- it was a legal adult website talking to somebody

3    who on that site set it up for me.  This is, I don't know,

4    back --

5             THE COURT:  And it's your representation to me that

6    Limewire, the Asstr, the Ares, and the GigaTribe --

7             THE DEFENDANT:  That what?  What was that last one?

8             THE COURT:  You're telling me you don't -- that someone

9    else set up all of those for you?

10            THE DEFENDANT:  No, no, just the Yahoo! Messenger.  I

11   didn't --

12            THE COURT:  But you downloaded Limewire.  You

13   downloaded Asstr, the A-S-S-T-R site --

14            THE DEFENDANT:  Asstr is just a website.

15            THE COURT:  You downloaded Ares?

16            THE DEFENDANT:  Ares?  I might have.  I don't remember.

17   I don't know how to use it and never have.

18            THE COURT:  And gained access to GigaTribe.  You just

19   don't recognize it as a name?

20            THE DEFENDANT:  I have never even heard of GigaTribe

21   that I know of.  I might have downloaded --

22            THE COURT:  These are some of the sites and programs

23   that were on your computer.  That's why I ask.

24            THE DEFENDANT:  Like I said, I have downloaded lots of

25   stuff onto my computer that I don't -- that I may have attempted
```

1    to use once or twice and never successfully used it, so I just

2    gave up on it.

3         THE COURT:  Some of these messages there's thousands of

4    exchanges, so you were using something regularly.

5         THE DEFENDANT:  Yeah.  I used Yahoo! Messenger

6    regularly up until --

7         THE COURT:  Until you moved to Facebook.

8         THE DEFENDANT:  Well, no.  There was, like, four years

9    between the two.

10        THE COURT:  Understood.

11        THE DEFENDANT:  Okay.

12        THE COURT:  I'm saying you used Yahoo!, and then later

13   you used Facebook.

14        THE DEFENDANT:  Yes, yeah.

15        MR. JONES:  Since we're getting into the details,

16   Judge, the Facebook was set up among his friends for -- because

17   they do a Dungeons & Dragons group, and they were just using it

18   for chat, and actually the evidence is quite clear that this

19   Santos McBride [verbatim] found his name through Facebook and

20   started messaging him.  So I just want to clarify that he didn't

21   just hop on Facebook for that sole purpose.

22        THE DEFENDANT:  Yeah.

23        THE COURT:  And, Counsel, Ms. Altman, do you know

24   whether this defendant used more sophisticated communication

25   means than those we've just discussed?  In other words, any

1       access through the dark side of the web through special

2       software.

3               MS. ALTMAN:  There's no indication of that, Your Honor,

4       of using like an anonymizing program or anything like that.

5       There's no evidence of that.

6               THE COURT:  The other thing is that you were very

7       specific in some of the things you asked for, and it's hard to

8       imagine that that just came out of thin air.  You obviously have

9       a fascination with really disturbing images.

10              THE DEFENDANT:  Talking about, yes.  Watching, no.

11              THE COURT:  But you got images back.  I don't know how

12      you can say "Watching, no."

13              THE DEFENDANT:  Well, or live -- live demonstrations,

14      no.

15              THE COURT:  Well, then why are there the repeated

16      requests for live demonstrations?

17              THE DEFENDANT:  Nothing has come of it.

18              THE COURT:  That's not what the text exchange says.

19      The text exchange says that they could get it for you and that

20      you sent money -- you sent over $5,000 worth of money through

21      Western Union for images, some of them apparently for live

22      images, although those weren't preserved.  It's hard -- you can

23      understand why, when I'm trying to understand what happened

24      here, it's hard to credit the notion that you didn't ask for and

25      enjoy receiving and viewed some very disturbing images.  And, I

1    mean, you've admitted your guilt here.  I'm just trying to

2    better understand what it is -- what conduct you engaged in, and

3    your effort to minimize it as "It's just things I asked for"

4    doesn't seem very credible.

5        I'm trying to find a reference to in your -- you attended

6    camps as a child or did you also -- were you also attending

7    camps as an adult?

8            THE DEFENDANT:  Camp -- well, "camp" is misleading.

9    The WCC, I don't know if you ever heard of it --

10           THE COURT:  I have, yeah.

11           THE DEFENDANT:  That's what she meant was WCC.

12           THE COURT:  And when did you do that?

13           THE DEFENDANT:  I want to say '95, somewhere around

14   there.

15           THE COURT:  And just for one year?

16           THE DEFENDANT:  Yeah.  It's a one-year -- well, you get

17   a job.  You only work for one year, unless you become a -- I

18   don't remember what they call it but basically like a boss

19   underneath the supervisor.  Then you get another year.

20           THE COURT:  All right.  And so you did it for one year?

21           THE DEFENDANT:  Yeah.

22           THE COURT:  Is there anything else that you'd care to

23   add before I render sentence?

24           MR. JONES:  Could I just have one second?

25           THE COURT:  Sure.

```
1           (Discussion held off the record between the defendant and
2     Mr. Jones.)
3                MR. JONES:  Judge, Mr. Tjader wanted me to explain to
4     you that he recalls the first time he asked for something really
5     shocking, there was kind of a pause, and nothing came of it, and
6     that's why he was proceeding in these chats without a real
7     compelling belief that many of these things that he was throwing
8     out there would actually come to fruition.  He just wanted to
9     make that statement.
10               THE COURT:  Did you want to clarify that?
11               THE DEFENDANT:  I just -- one thing I wanted to add to
12    it.  The first time I did, actually I got kind of scared when
13    there was a pause, and then she came back on.  Nothing happened
14    because I didn't want anything to happen like that.  I wasn't
15    thinking when I said it and just --
16               THE COURT:  But then you proceeded to make lots of
17    requests, and you got responses.
18               THE DEFENDANT:  Yeah, but nothing came of it so --
19               THE COURT:  I don't know what that means, "nothing came
20    of it."  Much came of it over time.
21               THE DEFENDANT:  Okay.  Responses came of it but --
22               THE COURT:  You sent them $5,000.
23               THE DEFENDANT:  Yeah.
24               THE COURT:  You must have gotten something for that.
25               THE DEFENDANT:  I've gotten shows.
```

1          THE COURT:  You've gotten lots of stuff, and apparently

2     there's gaps as to live images.

3          THE DEFENDANT:  Yeah.

4          THE COURT:  You've thought through this to try to

5     minimize it, but it doesn't come across as very credible.

6          THE DEFENDANT:  And I've gotten shows, mostly adult,

7     and nothing violent.

8          THE COURT:  I don't know how you can say that with some

9     of the images that are on your computer.

10          THE DEFENDANT:  Well, for the live shows.

11          THE COURT:  But the things you requested in the live

12     shows were quite violent.

13          THE DEFENDANT:  Yeah, but nothing -- but I got nothing

14     violent.

15          THE COURT:  I am prepared to render sentence.  The

16     defendant is a 44-year-old man before the Court for his first

17     criminal conviction of any kind.  He was an only child born to

18     parents who reportedly were nurturing and held the defendant to

19     reasonable, consistent expectations.  Overall, he is described

20     by his family as introverted and quiet but pleasant to be

21     around.  As a child, the defendant was engrossed in playing

22     video games, and he continues to describe video games as his

23     only passion in life.  Although his mother has questioned the

24     defendant's cognitive abilities throughout his life, he

25     graduated from high school and has maintained stable employment

1    since.  Nevertheless, the defendant has resided with his mother

2    for the entirety of his life, primarily in the basement

3    ostensibly because she is no longer able to care for the space

4    herself.  The defendant reports never having a meaningful

5    romantic relationship, but he has sustained close relationships

6    with his family and a few friends.

7         The defendant's criminal conduct is more egregious than

8    what is typically seen in receipt of child pornography cases.

9    In 2017, an ongoing investigation revealed the defendant had

10   received images of child pornography from sources in the

11   Philippines, including an individual from whom he requested

12   specific, graphic child pornography images and live stream video

13   in exchange for payment.

14        In October 2017, the defendant was arrested by case agents

15   at his home in Maple, Wisconsin, where they seized computer

16   equipment.  As I've already indicated, a forensic analysis of

17   that equipment determined the defendant's conduct involved 138

18   images and 118 videos containing child pornography, even after

19   accounting for duplicate images.  The images depicted the sexual

20   abuse of girls as young as infancy through the age of 14,

21   including vaginal penetration.  The defendant also admitted

22   using several peer-to-peer programs.  The defendant not only

23   received child pornography through email and peer-to-peer

24   programs but, as I've said, made specific requests for live

25   stream videos that depicted the sexual abuse of children and

1     solicited images for payment.  The defendant requested specific

2     items to take place over live video, including a person having

3     sex with a 6-year-old child, a child having sex with a dog,

4     killing a young child, and injuring a female child's genitals.

5     These requests were sadistic and abusive in nature.  The

6     defendant admitted to and demonstrated a pattern of behavior

7     that spanned over 15 years, and given the graphic nature of some

8     of his requests, it's hard to accept any explanation than the

9     defendant's fascination, perhaps addiction, to frightening

10    images.

11        Finally, the defendant agreed to participate in a polygraph

12    examination, failing the relevant questions when asked if he had

13    ever had sexual contact with a child.  That is hardly definitive

14    proof, but it is a further basis for concern by the Court.

15        Were it not for his first offender status and cognitive

16    limitations, a sentence at the top of the guideline would seem

17    in order.  Taking into consideration the nature of the offense

18    as well as the defendant's personal history and characteristics,

19    I am persuaded that a custodial sentence in the middle of the

20    guideline range is reasonable and no greater than necessary to

21    hold the defendant accountable, protect the community, provide

22    the defendant the opportunity for rehabilitative programs, and

23    achieve parity with the sentences of similarly situated

24    offenders.

25        As to Count 1 of the indictment, it is adjudged that the

1    defendant is committed to the custody of the Bureau of Prisons

2    for a term of 84 months.  I strongly recommend that he be placed

3    in an institution capable of addressing both his vulnerable

4    status and need for psychiatric and sex offender counseling.  I

5    also recommend that he be afforded prerelease placement in a

6    residential re-entry center with work release privileges and

7    ongoing sex offender programming.

8         Pursuant to the Sentencing Reform Act of 1984, the primary

9    goals of supervised release are to assist defendant's transition

10   into the community after a term of imprisonment and to provide

11   rehabilitation.  Supervision in this case will provide the

12   defendant with needed correctional programming, including

13   rehabilitative programs, to assist with community reintegration;

14   afford adequate deterrence to further criminal conduct; and

15   protect the public from further crimes perpetrated by the

16   defendant.

17        In particular, the offense of conviction, having involved

18   internet chats and communications with a third party in the

19   Philippines from 2012 to 2014 in which he made specific requests

20   for extreme child pornography, demonstrates the need to closely

21   monitor his communications online, as do the long-term viewing

22   habits of child pornography by this defendant and the cache of

23   photos and videos found in his computer equipment, including

24   long email -- or I'm sorry -- sizable email attachments.  While

25   the defendant denies having had physical sexual contact with a

1    child, the concern of the Court is that that may not be true

2    and, in any event, that there is a risk to society with this

3    defendant, further justifying the detailed supervision

4    requirements of the Court.  The defendant also will likely need

5    extensive help reintegrating with society upon his release, even

6    with his ability to maintain steady employment and share

7    expenses.  Accordingly, his term of imprisonment is to be

8    followed by a ten-year term of supervised release.

9        In light of the nature of the offense and the defendant's

10   personal history, I adopt conditions 1 through 4, 7 through 9,

11   and 11 through 19 as proposed and justified in the presentence

12   report.  The defendant raised written objections to Conditions

13   Nos. 12 through 14, 16, and 19 in the revised report.  Similar

14   objections have been raised before this court in the past and

15   denied, most recently in *United States v. Robert Tlusty*.  The

16   Court notes that should circumstances or the law change before

17   or during the defendant's term of supervised release, the

18   defendant will certainly have an opportunity to address concerns

19   of that nature to this court.  In the meantime, I do overrule

20   each of the objections for the following reasons:

21       As to Special Condition No. 12, financial monitoring

22   conditions are certainly necessary based on the nature of the

23   offense, including solicitation of images for payment.  The

24   probation office will need to monitor financial records of this

25   defendant, including credit card statements for the purchase of

1    computer equipment, internet services, illicit materials, as

2    well as to evaluate the defendant's characteristics or

3    capability to make payments of treatment costs.  The defendant's

4    personal characteristics include outstanding debts and

5    liabilities of over $20,000.  In addition, he will be required

6    to pay not only the statutory assessment but ongoing state and

7    federal income taxes during his supervision period.  Since this

8    financial monitoring condition is not overly burdensome and

9    serves the statutory purposes of sentencing and rehabilitation,

10   I do find it to be necessary and in compliance with -- to assure

11   compliance with the defendant's legal and financial obligations.

12        Special conditions 13 and 14 are appropriate to deter the

13   defendant from offense-related behaviors and to provide

14   monitoring to ensure the safety of the community.  Since the

15   defendant previously communicated with others online in

16   profoundly disturbing ways through file sharing and received

17   child pornography using a computer, various forms of monitoring

18   software will be necessary and may be installed on the computers

19   of the defendant, including electronic devices, after he is

20   released to supervision.  Any electronic item seized from the

21   defendant based on suspicion of contraband will also necessarily

22   be subject to further forensic analysis.  Currently there is no

23   statutory provision under Section 3583(d) in which a time frame

24   must be established to return these items, and I will not impose

25   strict deadlines for the return of any property removed for

1    inspection during supervision.  However, I will require that any

2    property be returned as soon as possible after inspection unless

3    the inspection is based on a reasonable suspicion that the

4    property is or contains contraband.  In that case, return of the

5    property will be at the discretion of the supervising officer,

6    and if opposed by the defendant, then he may seek release from

7    this court.

8         Special Condition No. 16, while not recommended by the

9    defendant, is a condition that includes Abel Screening and

10    plethysmograph testing.  This recommended condition is centered

11    around treatment and polygraph testing to be used as a treatment

12    tool.  Although the test results are not admissible as evidence

13    at trial, testing instruments may be used to assist the

14    treatment provider with addressing offense behavior and to

15    monitor the defendant to ensure community safety.  Accordingly,

16    use of such methods shall be at the treatment provider's

17    discretion.

18         Finally, Special Condition No. 19 was objected to regarding

19    the constitutionality of the sex offender registry as being

20    overly broad.  Given that this defendant has been convicted of

21    child pornography, there is little evidence to conclude he is a

22    child predator, but it remains a concern of this court, and,

23    therefore, at this point, since registration is required by

24    SORNA in both state and federal law, I am of the view that that

25    registration should be mandatory under the conditions imposed by

1    the Court as well, if for no other reason than it may prevent

2    any risk the defendant does pose to children.

3        If, when the defendant is released from confinement --

4    well, I guess, Mr. Jones, there is a question for you at this

5    point.  I've justified the individual conditions that you've

6    raised an objection to, but there remains some question as to

7    whether I should read into the record each of the individual

8    special conditions or conditions being imposed and justify each

9    of them individually unless the defense wishes to waive my doing

10   so, in which case I would incorporate the conditions verbatim as

11   well as the individual justifications along with those that I've

12   already set forth.

13       MR. JONES:  Right.  There's no need -- we would waive

14   the reading of any justification of the additional conditions

15   that we did not object to.

16       THE COURT:  All right.  And you have an understanding

17   and you've reviewed the basic conditions with your client?

18       MR. JONES:  Yes.  Mr. Tjader had his PSR for some time

19   and was able to review them and talk to me, so we've had plenty

20   of time -- so he is aware of those conditions and their

21   justification.

22       THE COURT:  Mr. Tjader, the only additional thing about

23   those conditions is when you're released, if you or the

24   probation office or both believe that any of the conditions no

25   longer are appropriate, you are welcome to come back to court,

1    and I would consider revisions to those conditions.

2         The instant offense is not drug related, and the defendant

3    has no history of drug use.  Therefore, the requirement for drug

4    testing is waived under Section 3583(d).

5         It is adjudged the defendant is to pay a $100 criminal

6    assessment penalty to the Clerk of Court for the Western

7    District of Wisconsin as required by statute.  That is due

8    immediately following sentencing.

9         But the defendant -- well, the defendant is to pay a

10   mandatory restitution to the U.S. Clerk of Court for the Western

11   District of Wisconsin.  My understanding is that the parties

12   have not yet agreed on a restitution amount, so pursuant to

13   Section 3664(d)(5) of Title 18, I will hold a restitution

14   hearing on September 7, 2018, at 1:00 p.m., although I encourage

15   the parties to see if they can reach some understanding as to

16   the amount before then.

17        I do find the defendant lacks the means to pay any further

18   fine under Section 5E1.C -- 1.2(c) without impairing his ability

19   to support himself upon release from custody.

20        I also find that he is indigent and that the $5,000

21   assessment under the Justice for Victims of Trafficking Act of

22   2015 is waived.

23        A final order of forfeiture will also be issued under

24   Section 2259 consistent with the parties' stipulation, but I

25   will grant that order today as well.

1        Finally, the U.S. Probation Office is to notify local law

2    enforcement agencies and the state attorney general of the

3    defendant's release back to the community.

4        I believe there are two counts that need to be dismissed at

5    this stage, Counsel?

6            MS. ALTMAN:  Yes, Your Honor, Counts 2 and 3.

7            THE COURT:  Counts 2 and 3 are dismissed, and, Mr.

8    Tjader, my last obligation is to ensure that you understand that

9    you have a right to appeal my sentence.  You have been

10   represented ably by Mr. Jones, and I'm confident that he would

11   discuss possible grounds for an appeal as well as assist you in

12   filing a notice of appeal if you wish to do so, but you only

13   have 14 days, so you should have that conversation sooner rather

14   than later.

15       I am hopeful that there may be some benefit to the

16   programming that is available in the federal system.  Your first

17   few months in that system will be discombobulating.  They'll be

18   confusing because you'll be moved from various institutions, but

19   I will note my strong recommendation that you end up in a

20   facility that has an opportunity for real programming as well as

21   is cognizant of the nature of the facility that is best for you.

22           THE DEFENDANT:  Am I going to be here until the --

23           THE COURT:  The restitution hearing?

24           THE DEFENDANT:  Yeah, that thing.

25           THE COURT:  That's an excellent question, and I don't

1    know the answer to that.  You can participate by phone if the

2    Bureau of Prisons decides to move you during this period, but we

3    will address that down the road with counsel.

4         Is there anything more for the government at this time?

5              MS. ALTMAN:  No, Your Honor.  Thank you.

6              THE COURT:  Anything more for the defense?

7              MR. JONES:  No.

8              AGENT JOHNSON:  Your Honor, could I just clarify one

9    thing for the record?  Special Condition No. 16, the probation

10   office didn't recommend Abel Screening or plethysmograph

11   testing, only the polygraph testing.

12             THE COURT:  And that's what I noted, but I'm not going

13   to restrict it.  I'm going to allow the provider to determine

14   what of those tests, if any, are appropriate for this defendant.

15             AGENT JOHNSON:  Yes.  Thank you, Your Honor.

16             THE COURT:  Is there anything else?

17             MR. JONES:  No.

18             MS. ALTMAN:  No, Your Honor.  Thank you.

19             THE CLERK:  All rise.  This court stands in recess.

20        (Proceedings concluded at 1:56 p.m.)

21                              ***

22

23

24

25

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2     Reporter in and for the State of Wisconsin, certify that the

3     foregoing is a true and accurate record of the proceedings held

4     on the 2nd day of July, 2018, before the Honorable

5     William M. Conley, U.S. District Judge for the Western District

6     of Wisconsin, in my presence and reduced to writing in

7     accordance with my stenographic notes made at said time and

8     place.

9          Dated this 17th day of July, 2018.

10

11

12

13

14

15                              /s/ Jennifer L. Dobbratz

16                     Jennifer L. Dobbratz, RMR, CRR, CRC
                              Federal Court Reporter
17

18

19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.